# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF NEW MEXICO

THI OF NEW MEXICO AT HOBBS
CENTER, LLC, THI OF NEW MEXICO,
LLC, FUNDAMENTAL ADMINISTRATIVE
SERVICES, LLC, and FUNDAMENTAL
CLINICAL CONSULTING, LLC,

        Plaintiffs,

v.                                                                      Civ No. 11-537 LH/CG

LILLIE MAE PATTON, as the personal
representative of the Estate of Willie
George Patton, Sr., deceased,

        Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

On June 17, 2011, Plaintiffs THI of New Mexico at Hobbs Center, LLC ("Hobbs Center");

THI of New Mexico, LLC ("THI-NM"); Fundamental Administrative Services, LLC ("FAS"); and

Fundamental Clinical Consulting, LLC ("FCC") (collectively, "Plaintiffs") filed a Motion to Compel

Arbitration (Doc. 3).  Plaintiffs request an order under the Federal Arbitration Act ("FAA"), 9

U.S.C. §§ 1-16, compelling Defendant Lillie Mae Patton ("Defendant" or "Ms. Patton" or "Mr.

Patton's Estate") to arbitrate claims that she has asserted on behalf of her deceased husband, Willie

George Patton, Sr., against Plaintiffs in the First Judicial District Court of New Mexico, *Patton v.

Fundamental Long Term Care Holdings, LLC, et al.*, D-101-cv-2011-01388 ("State Court Action").

Plaintiffs contend the claims in the State Court Action are subject to a binding, written arbitration

agreement (the "Arbitration Agreement").  Plaintiffs also seek an order under 9 U.S.C. § 3 staying

all further proceedings in this case and the State Court Action until such arbitration has occurred in

accordance with the terms of the  Arbitration Agreement.  The Court, having considered the motion,

briefs, supplemental authority, arguments, evidence, relevant law, and otherwise being fully

informed, concludes that Plaintiffs' motion to compel should be granted in part.

## I.      BACKGROUND[1]

On June 26, 2007, Willie Patton signed a Durable Power of Attorney for Health Care

(hereinafter "Power of Attorney"). (*See* Compl., Ex. B (Doc. 1-2) at 2, 8.)  The following provisions

are relevant to the operation of the Power of Attorney:

APPOINTMENT OF AGENT (ATTORNEY-IN-FACT):

In the event that I have been determined to be incapable of providing informed
consent for medical treatment and surgical and diagnostic procedures, I wish to
designate as my agent for health care decisions:

Lillie Mae Patton
. . .
Relationship: wife

APPOINTMENT OF ALTERNATE AGENT (ATTORNEY-IN-FACT)

If I revoke Lillie Mae Patton's authority or if Lillie Mae Patton is not willing, able,
or reasonably available to make a health care decision for me, I designate as my
alternate agent:

Linda Barry
. . .
Relationship: Daughter

(*Id.*, Ex. B (Doc. 1-2) at 2.)  The Power of Attorney authorized Mr. Patton's agent "to act for [him]

in all matters relating to [his] health care" – powers that included "[f]ull power to sign any

documents required to request . . . treatment . . . ."  (*Id.*, Ex. B (Doc. 1-2) at 3.)  The Power of

Attorney further provides: "All of my agent's actions under this power during any period when I am

unable to make or communicate health care decisions have the same effect on my heirs, devisees

---

[1]The following facts are largely undisputed.  Where a dispute exists, the Court will set
forth the parties' allegations.

and personal representatives as if I were competent and acting for myself." (*Id.*) Additionally, in signing the Power of Attorney, Mr. Patton stated: "I fully understand that by signing this document, I will permit my agent to make health care decisions for me. I understand that my signature on this document gives my agent authority to provide . . . health care treatments or procedures on my behalf; . . . and to authorize my admission to . . . a health care facility." (*Id.*, Ex. B (Doc. 1-2) at 4.)

On June 26, 2007, the same day Mr. Patton signed the Power of Attorney, Linda Barry, Mr. Patton's step-daughter, signed a standardized Admission Agreement that was "by and among Hobbs Health Care ('Health Care Center'), Willie Patton ('Resident') and/or Linda Barry POA ('Resident's Durable Power of Attorney for Health Care' . . . )." (*Id.*, Ex. A (Doc. 1-1) at 2, 12.) The Admission Agreement contains the following "Inducement" clause: "Resident and/or Representative affirm that all information submitted to Health Care Center in order to induce Health Care Center to enter into this Agreement is true and correct . . . . Submission of any false information will constitute a breach of this Agreement." (*Id.*, Ex. A (Doc. 1-1) at 2.) Mr. Patton was subsequently admitted into the Hobbs Center in Hobbs, New Mexico, to obtain care pursuant to the Admission Agreement.

That same day, on June 26, 2007, Ms. Barry also signed a standardized Arbitration Agreement, a separate document, that was

> made between Hobbs Health Care ("Health Care Center"), its parents, affiliates, and subsidiary companies, owners, officers, directors, medical directors, employees, successors, assigns, agents, attorney and insurers, Willie Patton ("Resident") and Linda Barry/POA ("Resident's Durable Power of Attorney for Health Care"/"Resident's Legal Guardian"/"Resident's Responsible Party" hereinafter collectively "Representative"). It is the intention of the parties to this Agreement to bind not only themselves, but also their successors, assigns, heirs, personal representatives, guardians or any persons deriving their claims through or on behalf of Resident.

(*Id.*, Ex. C (Doc. 1-3) at 2-3.)

Section I of the Arbitration Agreement, subtitled "Explanation," explains generally what

arbitration is and sets forth that "[b]oth parties to this agreement, by entering into it, are giving up their constitutional right to have any such dispute decided in a court of law before a jury, and instead are accepting the use of arbitration." (*Id.*, Ex. C (Doc. 1-3) at 2.)  The Arbitration Agreement also contains the following relevant provisions:

> It is understood by Resident and Representative that he or she is not required to use the aforesaid Health Care Center for Resident's healthcare needs and that there are numerous other health care providers in the State where the Health Care Center is located that are qualified to provide such care. *Resident/Representative understands that signing this Agreement to arbitrate is a precondition for medical treatment or admission to the Health Care Center. . . .*

> In the event of any controversy or dispute between the parties arising out of or relating to Resident's stay at the Health Care Center, the Health Care Center's Admission Agreement, or breach thereof, or relating to the provision of care or services to Resident, including but not limited to any alleged tort, personal injury, negligence, contract, consumer protection, claims under the New Mexico Unfair Trade Practices Act, or other claim; or any federal or state statutory or regulatory claim of any kind; or whether or not there has been a violation of any right or rights granted under State law (collectively "Disputes"), and the parties are unable to resolve such through negotiation, then the parties agree that such Dispute(s) shall be resolved by arbitration, as provided by the National Arbitration Forum Code of Procedure or other such association.[2]

> The parties agree that guardianship proceedings, *collection and eviction actions initiated by the Health Care Center*, any dispute where the amount in controversy is less than Two Thousand Five Hundred Dollars ($2,500.00) will be excluded from binding arbitration and may be filed and litigated in any court which may have jurisdiction over the dispute. . . .[3]

> This Agreement shall be governed by and interpreted under the Federal Arbitration Act, 9 U.S.C. Sections 1-16. . . .  In the event a court having jurisdiction finds any portion of this Agreement unenforceable, that portion shall not be effective and the remainder of the Agreement shall remain effective.

> . . . .

---

[2] The Court will refer to this paragraph as the "Arbitration Disputes Clause."

[3] The Court will refer to this paragraph as the "Exclusion Clause."

4

. . . By signing this Agreement, Representative certifies that he/she is duly authorized by law to execute this Agreement and agree to its terms on behalf of him/herself as Representative and on behalf of the Resident.

**RESIDENT/REPRESENTATIVE UNDERSTANDS THAT BY SIGNING THIS ARBITRATION AGREEMENT, HE/SHE IS WAIVING HIS/HER RIGHT TO HAVE CLAIMS, INCLUDING MALPRACTICE CLAIMS, HE/SHE MAY HAVE AGAINST THE HEALTH CARE CENTER (INCLUDING ITS PARENTS, AFFILIATES, AND SUBSIDIARY COMPANIES, OWNERS, OFFICERS, DIRECTORS, MEDICAL DIRECTORS, EMPLOYEES, SUCCESSORS, ASSIGNS, AGENTS, ATTORNEY AND INSURERS) BROUGHT AS A LAWSUIT IN COURT BEFORE A JUDGE OR JURY.**

(*Id.*, Ex. C (Doc. 1-3) at 2-3 (footnotes added, bold and capital emphasis in original, italicized emphasis added).)

At the time when Ms. Barry signed the aforementioned documents, Lillie Mae Patton was at the nursing home with her.  (*See* Def.'s Resp., Ex. 1 (Aff. of Linda Barry) (Doc. 11-1) ¶¶ 3, 9.) According to Ms. Barry, Ms. Patton "was with [her] the entire time when [Mr. Patton] was admitted to the [Hobbs] nursing home."  (*Id*. ¶ 9.)  Ms. Barry asserts that, when the nursing home gave her the documents to sign, they just pointed to where she needed to sign.  (*Id.* ¶ 12.)

On June 13, 2010, Mr. Patton was discharged from Hobbs Center, and according to Defendant's allegations, was septic and had an infected pressure sore on his sacrum.  (Def.'s Resp. (Doc. 11) at 1-2.)  Subsequently, Mr. Patton died.  On April 22, 2011, Defendant, as the personal representative of Mr. Patton's Estate, filed suit against Plaintiffs, as well as several other parties,[4]

---

[4]The other state court defendants are Rubin Schron, an individual who allegedly owns, operates, manages, and/or maintains "the Defendant corporations and Hobbs Center;" Leonard Grunstein, an individual who allegedly is engaged in the business of investing in, owning, operating, managing, and/or maintaining "the Defendant corporations and Hobbs Center;" Murray Forman, an individual who allegedly owns, operates, manages, and/or maintains "the Defendant corporations and Hobbs Center;" THI Holdings, LLC, a corporation that allegedly owns, operates, manages, and/or maintains Hobbs Center; Abe Briarwood Corporation, a corporation that allegedly owns Hobbs Center and entered into an agreement with one or more THI or Fundamental companies; and David Stroud, the Administrator of Hobbs Center.  (*See*

in state court for negligence, negligent or intentional misrepresentation, and punitive damages.  (*See* Compl, Ex. D (Doc. 1-4) ("State Court Complaint").)  Ms. Patton alleges that Hobbs Center, THI-NM, and FAS are in the business of owning, operating, managing and/or maintaining nursing homes and related healthcare facilities, including Hobbs Center.  (See id., Ex. D (Doc. 1-4) at 3-5.)  Ms. Patton further asserts that FAS receives a management fee of 4% of net operating revenue of each nursing home with which it contracts, including Hobbs Center, and that it calculates the fees that are owed from the facilities it serves and pays the vendors, rent, and all operating expenses for the facilities.  (*See id.*, Ex. D (Doc. 1-4) at 4.)   Ms. Patton additionally contends that FCC is in the business of providing consulting services to nursing homes and related healthcare facilities, including Hobbs Center.  (*See id.*)  Ms. Patton asserts that Mr. Patton suffered numerous injuries during his residency at Hobbs Center that required medical attention and hospitalization, that his overall health deteriorated, and that THI-Hobbs, THI-NM, FAS, and FCC, among others, are liable for damages arising from his substandard care.  (*See id.*, Ex. D (Doc. 1-4) at 10-12.)

On June 17, 2011, Hobbs Center, THI-NM, FAS, and FCC filed the lawsuit before this Court.  Plaintiffs seek an order compelling Defendant to arbitrate her claims asserted against them in the State Court Action, in accordance with the Arbitration Agreement, and staying this case and the State Court Action pending resolution of the matter through the arbitration process.  (Compl. (Doc. 1) ¶¶ A-C.)  Plaintiffs simultaneously filed a Motion to Compel Arbitration requesting the same relief sought in their Complaint (Doc. 3).

Defendant opposes the motion on three grounds.   First, Defendant contends that no agreement to arbitrate exists.  Defendant argues that none of the Plaintiffs except Hobbs Center is

---

Compl., Ex. D (Doc. 1-4) at 3-6.)

bound by the Arbitration Agreement because they are neither named in nor signatories to the Arbitration Agreement.  Defendant also asserts that Mr. Patton's Estate cannot be bound by the Arbitration Agreement because Ms. Barry lacked the authority to enter into the contract on Mr. Patton's behalf.  Defendant argues that Ms. Barry was the alternate attorney-in-fact and there is no evidence that the contingency – Ms. Patton being "not willing, able or reasonably available to make health care decisions for" Mr. Patton – had occurred to give her authority.  Second, Defendant asserts that procedural and substantive unconscionability preclude enforcement of the Arbitration Agreement.  Finally, Defendant argues that estoppel, waiver, ratification, and third-party beneficiary doctrines do not apply to render the Arbitration Agreement binding upon Mr. Patton's Estate.  As to the latter doctrine, Defendant contends that the signing of the Arbitration Agreement was to Mr. Patton's detriment.

Plaintiffs counter that they all can enforce the Arbitration Agreement because, although THI-NM, FAS, and FCC are non-signatories to the contract, the Arbitration Agreement encompassed Hobbs Center and its parents, owners, and affiliates.  Plaintiffs further contend that Mr. Patton was bound by the Arbitration Agreement as a third-party beneficiary of the Admission Agreement, regardless of whether Ms. Barry had the authority under the Power of Attorney to sign for Mr. Patton.  Plaintiffs also argue that, because Ms. Lillie Mae Patton was present when Ms. Barry signed the aforementioned documents but never objected to Ms. Barry exercising her authority as Mr. Patton's alternate attorney-in-fact, Mr. Patton's Estate cannot now claim that Ms. Barry lacked authority to sign for him.  Finally, Plaintiffs dispute that procedural or substantive unconscionability preclude enforcement of the Arbitration Agreement.

## II.    STANDARD

The Federal Arbitration Act ("FAA") provides:

7

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, . . . *shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract*.

9 U.S.C. § 2 (emphasis added).  Arbitration agreements may thus be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability.  *Rent-A-Center, West, Inc. v. Jackson*, __ U.S. __, 130 S.Ct. 2772, 2776 (2010).

Congress's purpose in enacting the FAA was "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991).  The FAA thus "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983)).

The FAA "provides two parallel devices for enforcing an arbitration agreement:  a stay of litigation in any case raising a dispute referable to arbitration, 9 U.S.C. § 3, and an affirmative order to engage in arbitration, § 4." *Moses H. Cone Memorial Hosp.*, 460 U.S. at 22.  Under Section 4 of the FAA, a court may order the parties to arbitrate "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue."  9 U.S.C. § 4.  When the making of an arbitration agreement is at issue, the court must proceed to the trial of that issue. *Id.*  A court should only decide as a matter of law whether the parties entered into an agreement to arbitrate when there is no genuine issue of material fact concerning the formation of the agreement. *See Avedon Engineering, Inc. v. Seatex*, 126 F.3d 1279, 1283 (10th Cir. 1997); *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir. 1980).  When faced with a motion to

compel arbitration that is opposed based on whether an agreement to arbitrate has been made between the parties, the court must give to the opposing party the benefit of all reasonable doubts and inferences that may arise. *See Par-Knit Mills*, 636 F.2d at 54.

In enacting the FAA, Congress did not intend to force parties to arbitrate in the absence of an agreement, and therefore the "existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." *Avedon*, 126 F.3d at 1286-87. When the parties dispute the existence of a valid arbitration agreement, the presumption in favor of arbitration disappears. *Dumais v. American Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir. 2002). Consequently, a federal court looks to state law principles of contract formation to determine whether an agreement to arbitrate had been reached:

> In applying state law, [a] court may not . . . construe [an arbitration] agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law. However, it is only when [a] state-law principle . . . takes its meaning precisely from the fact that a contract to arbitrate is at issue that the state law will be preempted by the FAA.

*Avedon*, 126 F.3d at 1287 (internal quotations and citations omitted). Thus, courts generally apply state law on the formation of contracts to determine whether a party agreed to arbitrate a dispute. *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir. 2006). "A party seeking judicial enforcement of a contract bears the burden of persuasion." *Farmington Police Officers Ass'n Communication Workers of America Local 7911 v. City of Farmington*, 2006-NMCA-077, ¶ 16, 139 N.M. 750.

## III.    ANALYSIS

### A.    The Court Need Not Decide Whether the Power of Attorney Authorized Ms. Barry to Bind Mr. Patton's Estate to the Arbitration Agreement

The Admission Agreement and Arbitration Agreement contained therein were signed by an

official for Hobbs Center and by Linda Barry, Mr. Patton's step-daughter, the alternate agent in his Power of Attorney.  Defendant argues that Ms. Barry, as alternate agent, signed the Power of Attorney when the primary agent, Ms. Lillie Mae Patton, was willing, able, or reasonably available to make a health care decision for Mr. Patton.  Accordingly, Defendant asserts that the Power of Attorney did not give Ms. Barry the authority to act as Mr. Patton's agent, and thus, her signing the Arbitration Agreement does not bind Mr. Patton's Estate to that agreement under agency theory.  This Court does not reach the agency issue because the third-party beneficiary and equitable estoppel doctrines bind Mr. Patton's Estate to the Agreement.

### B.    Mr. Patton's Estate is Bound by the Arbitration Agreement based on the Third-Party Beneficiary and Equitable Estoppel Doctrines

If Ms. Barry was not duly authorized to sign the Arbitration Agreement for Mr. Patton, the issue arises as to whether Mr. Patton's Estate could be bound to its terms as a "non-signatory."  The parties contest whether state or federal law applies to the issue of whether a non-signatory can be bound by, or compel arbitration under, an arbitration agreement.  In 2009, the Supreme Court in *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 129 S.Ct. 1896, 1902 (2009), made clear that state law applies to that question.[5]  In *Carlisle*, the Supreme Court held that non-parties to a written

---

[5]Prior to 2009, most of the federal circuit courts had applied the federal substantive law of arbitrability to resolve questions of the extent a non-signatory can be bound by an arbitration clause.  *See Washington Mut. Fin. v. Bailey*, 364 F.3d 260, 267-68 n.6 (5th Cir. 2004) (collecting cases and adopting the Fourth Circuit's analysis and conclusion to follow federal law); *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 417 n.4 (4th Cir. 2000) (holding that federal substantive law of arbitratrability controls when determining whether non-signatory is bound by arbitration contract because it presents no state law question of contract formation or validity).  *But see JP Morgan Chase & Co. v. Conegie ex rel. Lee*, 492 F.3d 596, 598 & n.1-2 (5th Cir. 2007) (noting, without resolving issue, that Fifth Circuit has precedent applying state law and federal law to question whether non-signatory is bound by arbitration clause).  Few of the other circuits, including the Tenth Circuit, explained in detail why federal substantive law applied; instead, they merely cited federal case law.  *See, e.g.*, *Dominium Austin Partners, L.L.C. v. Emerson*, 248 F.3d 720, 728 (8th Cir. 2001); *MS Dealer*

arbitration agreement are not categorically ineligible for relief. *See id.* at 1901-02. In so holding, the Supreme Court explained the interplay between state and federal law when construing legal and equitable issues surrounding arbitration agreements:

> Neither [Section 2 nor Section 3 of the FAA] purports to alter background principles of state contract law regarding the scope of agreements (including the question of who is bound by them). Indeed § 2 explicitly retains an external body of law governing revocation (such grounds "as exist at law or in equity"). And we think § 3 adds no substantive restriction to § 2's enforceability mandate. "[S]tate law," therefore, is applicable to determine which contracts are binding under § 2 and enforceable under § 3 "*if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." Because "traditional principles" of state law allow a contract to be enforced by or against nonparties to the contract through "assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel," the Sixth Circuit's holding that nonparties to a contract are categorically barred from § 3 relief was error.

*Id.* at 1902 (internal citations and footnote omitted). The Supreme Court further noted that, whatever the meaning of the "vague prescription" in *Moses H. Cone* that "questions of arbitrability . . . be addressed with a healthy regard for the federal policy favoring arbitration," it "cannot possibly require the disregard of state law *permitting* arbitration by or against nonparties to the written arbitration agreement." *Id.* n.5 (quoting *Moses H. Cone*, 460 U.S. at 24-25). The Supreme Court held that "a litigant who was not a party to the relevant arbitration agreement may invoke § 3 if the *relevant state contract law* allows him to enforce the agreement." *Id.* at 1903 (emphasis added).

Consequently, in the wake of *Carlisle*, courts must look to state law relating to contracts in general to determine who may be bound to an arbitration provision. *See Lenox MacLaren Surgical*

_____

*Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999); *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776-78 (2d Cir. 1995); *O'Connor v. R.F. Lafferty & Co., Inc.*, 965 F.2d 893, 901-02 (10th Cir. 1992).

*Corp. v. Medtronic, Inc.*, No.11-1251, 2011 WL 5545420, at *4-5 & n.2 (10th Cir. Nov. 15, 2011) (unpublished opinion) (examining Colorado state law); *Lawson v. Life of the South Ins. Co.*, 648 F.3d 1166, 1170-71 (11th Cir. 2011) (applying Georgia state law to question of whether non-party can enforce arbitration clause in loan agreement against party to arbitration clause under doctrine of equitable estoppel and clarifying that "to the extent any of our earlier decisions indicate to the contrary, those indications are overruled or at least undermined to the point of abrogation by *Carlisle*").

Turning to New Mexico law, "[g]enerally, third parties who are not signatories to an arbitration agreement are not bound by the agreement and are not subject to, and cannot compel, arbitration." *Horanburg v. Felter*, 2004-NMCA-121, ¶ 16, 136 N.M. 435.  There are, however, exceptions to this rule.  *See id.* ¶¶ 16-17 (listing some of the exceptions that have been used in federal cases).  Two such exceptions that may hold a non-signatory to an arbitration agreement are the third-party beneficiary doctrine and equitable estoppel. *See Carlisle*, 556 U.S. at __, 129 S.Ct. at 1902.

### 1.     Third-Party Beneficiary Doctrine

New Mexico law permits a third-party beneficiary of a contract to have an enforceable right against a party to the contract, even though the beneficiary is not a party to the contract. *See Fleet Mortgage Corp. v. Schuster*, 112 N.M. 48, 49 (1991).  "Whether a party is a third-party beneficiary depends on if the parties to the contract intended to benefit the third party." *Id.* at 49-50.  "The promisor must have 'had reason to know the benefit was contemplated by the promisee as one of the motivating causes for entering the contract.'" *Dona Ana Mut. Domestic Water Consumers Ass'n v. City of Las Cruces*, 516 F.3d 900, 907 (10th Cir. 2008) (quoting *Tarin's, Inc. v. Tinley*, 3 P.3d 680, 686 (N.M. Ct. App. 1999)).  Such intent must appear either from the contract itself or from

12

some evidence that the third person was an intended beneficiary.  *Schuster*, 112 N.M. at 50.

The New Mexico Supreme Court has not specifically addressed whether and under what circumstances the third-party beneficiary doctrine might apply to enforce an arbitration agreement between a signatory and non-signatory.  The New Mexico Court of Appeals, however, has applied the third-party beneficiary doctrine to an arbitration agreement when it held that a non-signatory to an arbitration agreement had a right to compel arbitration against a signatory to that agreement where the face of the arbitration agreement showed the parties' intent to grant to a class of entities, to which the non-signatory belonged, rights under the arbitration provisions.  *See Rivera v. American Gen. Fin. Servs., Inc.*, 2010-NMCA-046, ¶¶ 20-22, *reversed on other grounds by* 2011-NMSC-033, 259 P.3d 803.

The question remains as to the scope of the third-party beneficiary doctrine, particularly whether a non-signatory to the agreement can be forced to arbitrate pursuant to the doctrine.  The third-party beneficiary doctrine, as generally stated, allows the beneficiary to have an enforceable right *against* a party to the contract.  *See Dona Ana Mut. Domestic Water Consumers*, 516 F.3d at 907 (quoting *Schuster*, 811 P.2d at 82).[6]  Indeed, the New Mexico cases cited by Plaintiffs involve a non-signatory, purported third-party beneficiary attempting to enforce the terms of the contract against a signatory.  *See*, *e.g.*, *Callahan*, 2006-NMSC-010, ¶¶ 20-21; *Rivera*, 2010-NMCA-046,

---

[6]*See also MS Dealer*, 177 F.3d at 947 ("A third exception arises when the parties to a contract together agree, upon formation of their agreement, to confer certain benefits thereunder upon a third party, affording that third party rights of action against them under the contract.") (internal quotations omitted); *Callahan v. New Mexico Federation of Teachers-TVI*, 2006-NMSC-010, ¶¶ 20-21, 139 N.M. 201 ("A third-party may have an enforceable right against an actual party to a contract if the third-party is a beneficiary of the contract."); *see also* Restatement (Second) of Contracts § 304 ("A promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may *enforce* the duty.") (emphasis added).

¶¶ 20-22; *Schuster*, 112 N.M. at 49-50; *see also Gibson v. Wal-Mart Stores, Inc.*, 181 F.3d 1163, 1170 n.3 (10th Cir. 1999).

This case, with respect to compelling Mr. Patton's Estate to participate in arbitration, involves the inverse – Plaintiffs are attempting to enforce the contract against a non-signatory third-party beneficiary.  A number of courts in other jurisdictions have used the third-party beneficiary doctrine to compel a non-signatory to arbitrate in circumstances similar to those here.  *See JP Morgan Chase*, 492 F.3d at 600 (holding under federal law that, where agreement signed by nursing home resident's mother on resident's behalf expressly named resident as person receiving care, non-signatory resident was third-party beneficiary of contract and bound by agreement to arbitrate contained therein); *THI of South Carolina at Columbia, LLC v. Wiggins*, No. 3:11-888-CMC, 2011 WL 4089435, *6 (D. S.C. Sept. 13, 2011) (unpublished opinion) (holding that, under South Carolina law, arbitration provision in admission contract was binding on estate because decedent was third-party beneficiary of contract that was signed by his family member where decedent's care was essential purpose of contract); *Cook v. GGNSC Ripley, LLC*, 786 F.Supp.2d 1166, 1171-72 (N.D. Miss. 2011) (applying Mississippi state law in holding that nursing home resident was intended third-party beneficiary of agreement signed by official of nursing home and resident's daughter, and thus, resident was bound by terms of contract including arbitration agreement); *Alterra Healthcare Corp. v. Estate of Linton*, 953 So.2d 574, 579 (Fla. App. 2007) (arbitration clause in assisted living facility's residency agreement was binding on resident's estate, even though agreement was not signed by resident, but rather her son, where resident was intended third-party beneficiary to agreement); *Owens v. Coosa Valley Health Care, Inc.*, 890 So.2d 983, 987 (Ala. 2004) (non-signatory nursing home resident bound by terms of arbitration agreement in contract with nursing home where resident's guardian entered into agreement with home on resident's behalf).  This Court

concludes that the New Mexico Supreme Court would likely follow the reasoning of the cases cited herein extending the third-party beneficiary doctrine to the situation at hand.

Application of this doctrine requires an underlying contract, the performance of which is intended to benefit the third-party beneficiary. Ms. Barry signed the Admissions Agreement on both the line for "Signature of Resident" and the line for "Signature of Representative." (*See* Compl., Ex. A (Doc. 1-1) ¶ XVI.)   Ms. Barry, in signing the Admissions Agreement, expressly acknowledged that she was acting in more than one capacity. (*See* Compl., Ex. A (Doc. 1-1) ¶ I(4) ("Representative may act in more than one capacity and will be bound by the applicable terms and conditions of this Agreement.").)   Indeed, Ms. Barry's signature bound her personally in certain circumstances. (*See id.*, Ex. A (Doc. 1-1) ¶ I(4) ("Except when Representative has access to Resident's assets, or as otherwise expressly provided to the contrary herein, or as permitted by state or federal law, Representative will not become personally liable for the payment of Resident's fees and charges by signing this Agreement.") and ¶ XV(4) ("Failure to utilize the Resident's income or resources for payment to the Health Care Center may subject Representative to legal action.").)   The Court concludes that, without relying on Ms. Barry's authority under the Power of Attorney, the requisite underlying contract was entered into by Ms. Barry and Hobbs Center. *Cf. Wiggins*, 2011 WL 4089435, at *6 ("Hall was an intended third-party beneficiary of the Contract which was signed by Wiggins in her capacity as an immediate family member.").

The next question is whether Mr. Patton is a third-party beneficiary of that contract. The undisputed facts establish that Mr. Patton was a third-party beneficiary to both the Admission Agreement and the Arbitration Agreement contained therein, based on the clear terms of the agreements. He was the named resident to be admitted to the facility and the terms of the Admission Agreement refer to benefits and responsibilities of the resident. Mr. Patton's care was the essential

15

purpose of the Agreement.  Ms. Barry's Affidavit confirms that the motivating cause for entering the Admission Agreement was to benefit Mr. Patton.

Defendant's primary argument against application of the third-party beneficiary doctrine is that the signing of the arbitration clause was not beneficial to Mr. Patton's Estate.  The New Mexico Court of Appeals, however, recently stated that arbitration conveys benefits such as speed of resolution and reduced litigation costs.  *Barron v. The Evangelical Lutheran Good Samaritan Soc'y*, 2011-NMCA-094, ¶ 41, __ P.3d __.  Moreover, Mr. Patton received benefits from the Admission Agreement as a whole, of which the Arbitration Agreement was just one part.  Indeed, Mr. Patton was a resident of the Hobbs Center for approximately three years during which time he received nursing care services.  Mr. Patton therefore received benefits from both the Admission Agreement as a whole and the Arbitration Agreement in particular.

The Court concludes that Mr. Patton was a third-party beneficiary of both agreements, and that, even though Mr. Patton was a non-signatory thereto, his Estate must be bound by their terms, including the Arbitration Agreement.

## 2.    Equitable Estoppel Doctrine

Even if New Mexico courts would not extend the third-party beneficiary doctrine to allow a signatory to enforce a contract against a non-signatory, New Mexico courts would come to the same result under the equitable estoppel doctrine.  New Mexico has recognized the equitable estoppel doctrine in non-arbitration contexts.  *See*, *e.g.*, *Brown v. Taylor*, 120 N.M. 302, 305 (1995).  Section 2 of the FAA requires that New Mexico courts treat arbitration agreements similarly to other contracts, and therefore the New Mexico courts would recognize the equitable estoppel doctrine in arbitration contexts as well.  *See Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987) ("A court may not, then, in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement

16

in a manner different from that in which it otherwise construes nonarbitration agreements under state law.").

Under New Mexico law, equitable estoppel "is the preclusion, by acts or conduct, from asserting a right which might otherwise have existed, to the detriment and prejudice of another, who, in reliance on such acts and conduct, has acted thereon." *Brown*, 120 N.M. at 305 (internal quotations omitted). In this case, Plaintiffs are essentially arguing that Ms. Patton, through her conduct, has impliedly waived the contractual defense that the Arbitration Agreement is not binding on her, as the representative of the Estate. To establish waiver by estoppel, the party asserting the doctrine must show that (1) the party to be estopped made a misleading representation by conduct; (2) the party claiming estoppel had an honest and reasonable belief based on that conduct that the party to be estopped would not assert a certain right under the contract or a defense thereto; and (3) the party claiming estoppel acted in reliance on the conduct to its detriment or prejudice. *See id.* at 305-06.

In this case, it is undisputed that Ms. Patton was present when Mr. Patton was admitted to the facility and when Ms. Barry signed the admission documents. Mr. Patton signed the Power of Attorney the same day during the admissions process. It is undisputed that Ms. Patton never expressed any verbal objection to Ms. Barry signing the admissions documents. Ms. Patton's conduct conveyed that she was unwilling or unable to sign the documents, and that she acceded in Ms. Barry exercising her authority to sign the documents for Mr. Patton. The Court considers her conduct to be a misleading representation, given her current argument suggesting that she may have been willing and able to sign the documents during the admission process. The second element for equitable estoppel is also met, because Hobbs Center had an honest and reasonable belief based on Ms. Patton's conduct that she and the Estate would not subsequently disavow the Arbitration

17

Agreement, the signing of which was a prerequisite for admission, particularly after Mr. Patton received services under the Admissions Agreement for over three years.  Finally, the third equitable estoppel element is met because Hobbs Center acted in reliance on Ms. Patton's and Ms. Barry's conduct in admitting Mr. Patton into the facility and providing him care – actions it would not have taken had Mr. Patton's representative not signed the Arbitration Agreement.  Mr. Patton subsequently received approximately three years of care at the facility, of which Ms. Patton must have been aware.  Mr. Patton thus embraced and directly benefitted from the Arbitration Agreement.  Accordingly, equitable principles should estop Mr. Patton's Estate from invoking the benefits of the Arbitration Agreement – three years of care – while simultaneously rejecting the perceived detriments to that agreement.  This case falls within the class of cases in which courts have used equitable principles to bind non-signatories to arbitration agreements.[7]

-------

[7]*See American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 350-53 (2d Cir.1999) (applying  "direct benefit" test to estop non-signatory whose ship suffered hull damage and who sued ship classification society that issued interim certificate of classification that explicitly incorporated contract between society and shipyard, which contained arbitration clause, from denying that arbitration clause applied to it when non-signatory received benefits from contract containing the arbitration clause, including lowered insurance rates and ability to sail under French flag); *Deloitte Noraudit A/S v. Deloitte Haskins & Sells*, U.S., 9 F.3d 1060, 1064 (2d Cir. 1993) (compelling non-signatory to arbitrate based on equitable estoppel, even though non-signatory's claims arose from separate agreement that did not contain arbitration clause, because it failed to object to new agreement containing arbitration clause and it knowingly accepted benefits of the new agreement through its continuing use of the name "Deloitte"); *Wiggins*, 2011 WL 4089435 at *6 (holding that, where entity operating residential health center performed in reliance on the terms of Contract and resident received benefit of Contract, as he was resident of center and received care there for extended period of time, it would be inequitable for resident's estate to avoid Contract's Arbitration Provision, even where resident's estate's claims were in tort); *Cherry Creek Card & Party Shop, Inc. v. Hallmark Marketing Corp.*, 176 F.Supp.2d 1091, 1098 (D. Colo. 2001) (acknowledging that courts have held non-signatories to an arbitration clause when the non-signatory "knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement") (citing *Thomson-CSF*, 64 F.3d at 778); *Murken v. Suncor Energy, Inc.*, 2005-NMCA-102, ¶¶ 11, 13, 138 N.M. 179 (suggesting that, in the right case, New Mexico would use equitable estoppel to bind a non-signatory plaintiff to an arbitration agreement with a defendant signatory where the

In sum, Defendant's efforts to come in at the eleventh hour and claim that the Arbitration Agreement, but not the Admission Agreement, is invalid because Ms. Barry did not have proper authority under the circumstances to act under the Power of Attorney granted to her by Mr. Patton is unreasonable and disingenuous.  Ms. Patton sat idly by while Ms. Barry signed all the paperwork and throughout three years of reliance on the Admission Agreement.  Because Mr. Patton was the intended third-party beneficiary of the Admission Agreement, and the benefits he received from that agreement were expressly contingent upon his or his representative signing the Arbitration Agreement, Defendant is bound by the Arbitration Agreement contained therein.

**C.      THI-NM Can Enforce the Arbitration Agreement, but FAS and FCC Cannot**

Defendant next argues that, even if Mr. Patton's Estate is bound to the Arbitration Agreement, Plaintiffs THI-NM, FAS, and FCC cannot enforce it because they, too, are non-signatories of the agreement, and that "Plaintiffs may not claim, on the one hand, that they are able to compel arbitration of disputes against them, based upon allegations of joint venture in Defendant's complaint, while simultaneously decrying any liability based upon that exact same theory."  (Def.'s Resp. (Doc. 11) at 4-5.)  Plaintiffs THI-NM, FAS, and FCC counter that they can compel arbitration, even though they are non-signatories to the Arbitration Agreement, because the Arbitration Agreement itself says that they are parties to the agreement, which empowers them to enforce the agreement.  Additionally, they assert that they can enforce the agreement under the doctrine of equitable estoppel.

**1.      Third-Party Beneficiary Doctrine**

As discussed *supra*, "[g]enerally, third parties who are not signatories to an arbitration

---

non-signatory embraced and directly benefitted from the underlying agreement).

agreement are not bound by the agreement and are not subject to, and cannot compel, arbitration." *Horanburg*, 2004-NMCA-121, ¶ 16. A third-party beneficiary of an arbitration contract, however, can compel arbitration under the contract. *Cf. Schuster*, 112 N.M. at 49. To determine whether the parties intended a non-signatory to be a third-party beneficiary, a court must look within the four corners of the contract. *Brantley v. Republic Mortgage Ins. Co.*, 424 F.3d 392, 396 (4th Cir. 2005). Consequently, if THI-NM, FAS, and FCC can show that the Arbitration Agreement defined them as parties to the agreement, they can enforce the terms of the agreement under the third-party beneficiary doctrine. The Court will therefore first turn to the question of which Plaintiffs are expressly covered by the terms of the Arbitration Agreement.

### a.    THI-NM Is, by Definition, a Covered Entity under the Arbitration Agreement, but FAS and FCC Are Not

The Arbitration Agreement states in bold, capital letters:

**RESIDENT/REPRESENTATIVE UNDERSTANDS THAT BY SIGNING THIS ARBITRATION AGREEMENT, HE/SHE IS WAIVING HIS/HER RIGHT TO HAVE CLAIMS, INCLUDING MALPRACTICE CLAIMS, HE/SHE MAY HAVE AGAINST THE HEALTH CARE CENTER (INCLUDING ITS PARENTS, AFFILIATES, AND SUBSIDIARY COMPANIES, OWNERS, OFFICERS, DIRECTORS, MEDICAL DIRECTORS, EMPLOYEES, SUCCESSORS, ASSIGNS, AGENTS, ATTORNEY AND INSURERS) BROUGHT AS A LAWSUIT IN COURT BEFORE A JUDGE OR JURY.**

As evidenced by the plain language of their Arbitration Agreement, the parties intended to convey the benefits of the Arbitration Agreement to the persons and entities listed in the parenthetical: Hobbs Center's "parents, affiliates, and subsidiary companies, owners, officers, directors, medical directors, employees, successors, assigns, agents, attorney and insurers."

Attempting to fall within this language, Plaintiffs THI-NM, FAS, and FCC focus on the terms "parents," "affiliates," and "owners." The relevant terms are not defined by the Admission Agreement, so the Court will first look to the dictionary to determine the natural, reasonable

meaning of the terms.  *See Carmichael v. The Payment Center, Inc.*, 336 F.3d 636, 640 (7th Cir. 2003) (noting that ordinary or natural meaning may be supplied by a dictionary) (citing *FDIC v. Meyer*, 510 U.S. 471, 476 (1994)); *Spingola v. Spingola*, 91 N.M. 737, 743 (1978) (looking to dictionary to determine accepted lay meaning of term).   A "parent company" is commonly understood as a "company that controls or owns another company or companies."  The American Heritage Dictionary 1277 (4th ed. 2006).  The term "affiliate" means "[a] person, organization, or establishment associated with another as a subordinate, subsidiary, *or member*."  *Id*. at 29 (emphasis added).

It is undisputed that Hobbs Center is a limited liability company ("LLC") whose sole member is Plaintiff THI-NM, which in turn is an LLC whose single member is THI of Baltimore, Inc. ("THI Baltimore"), a Delaware corporation.  (*See* Compl. (Doc. 1) ¶ 1.)  Defendant alleges in the State Court Complaint that THI-NM and THI Baltimore are "in the business of owning, operating, managing, and/or maintaining nursing homes and related healthcare facilities, including Hobbs Center."  (State Court Compl. (Doc. 1-4) ¶¶ 5, 7.)   Because Plaintiff THI-NM is the sole member of Hobbs Center, it constitutes an affiliate of Hobbs Center, and therefore, is within the ambit of entities against whom Mr. Patton's rights to bring certain claims in a court of law were waived.

Plaintiff FAS is an LLC whose sole member is Fundamental Long-Term Care Holdings, LLC ("FLTCH").  (*See* Compl. (Doc. 1) ¶¶ 1-2.)  FLTCH is an LLC with two members, real persons who are citizens of New York and New Jersey.  (*See id.* ¶ 2.)   According to the State Court Complaint, FAS and FLTCH are "in the business of owning, operating, managing, and/or maintaining nursing homes and related healthcare facilities, including Hobbs Center."  (State Court Compl. (Doc. 1-4) ¶¶ 10, 14.)  Defendant also alleges in the State Court Complaint that "FLTCH

is the sole shareholder of THI Baltimore, which is the sole shareholder of THI New Mexico, which is the sole shareholder of THI Hobbs Center" and that the address for FLTCH, THI Baltimore, FAS, and FCC is the same. (*See id.* ¶¶ 15-16.) Defendant asserts that FAS receives a management fee of 4% of net operating revenue of each nursing home with which it contracts, including Hobbs Center, and that it calculates the fees that are owed from the facilities it serves and pays the vendors, rent, and all operating expenses for the facilities. (*Id.* ¶ 11.)

The Court concludes that there is nothing in the record to demonstrate that Plaintiff FAS is a listed entity covered by the Arbitration Agreement. The State Court Complaint alleges that Plaintiff FAS owns, operates, manages, "and/or" maintains nursing homes, including Hobbs Center. The disjunctive does not permit the Court to find that Plaintiff FAS owns or controls Hobbs Center. Rather, FAS has a contractual relationship with Hobbs Center in which it provides certain services for Hobbs Center. (*See id.*) Thus, the Court cannot conclude that Plaintiff FAS is Hobbs Center's parent company or owner. Nor does the record reflect that Plaintiff FAS is a subsidiary of Hobbs Center. That leaves the Court to determine whether Plaintiff FAS is Hobbs Center's "affiliate." The only remaining definition of affiliate that could fit here is a "member." Although FAS's sole member is FLTCH, who is a sole shareholder of THI Baltimore, which is the sole member of THI-NM, which is the sole member of Hobbs Center, the membership between FAS and Hobbs Center is too attenuated and indirect for this Court to determine as a matter of law that the parties contemplated FAS to be an entity covered by the contract.

The Court reaches a similar conclusion as to Plaintiff FCC. It is also undisputed that Plaintiff FCC is an LLC whose sole member is also THI Baltimore, which as previously described, is the sole member of THI-NM, which is the sole member of Hobbs Center. (*See* Compl. (Doc. 1) ¶ 1.) According to the State Court Complaint, FCC is in the business of providing consulting

services to nursing homes and related healthcare facilities, including Hobbs Center, and FCC employs the Regional Director of Operations who is in charge of advising Hobbs Center about how to increase profits and meet budget expectations.  (State Court Compl. (Doc. 1-4) ¶¶ 12-13.)  This Court concludes that Plaintiff FCC does not meet the definition of a parent company because there is no evidence FCC owns or controls Hobbs Center; rather, it only appears to provide consulting services to Hobbs Center.  Furthermore, FCC is neither a subsidiary nor a subordinate to Hobbs Center.  Although FCC's sole member is THI Baltimore, which is the sole member of THI-NM, which is the sole member of Hobbs Center, the membership between FCC and Hobbs Center is indirect and too attenuated and unclear for the parties to have contemplated FCC to be covered by the contract.

> **b.**     **THI-NM can Compel Arbitration under the Third-Party Beneficiary Doctrine, but FAS and FCC Cannot**

Plaintiffs FAS and FCC do not fall within any of the classes of entities over which the parties intended the Arbitration Agreement to extend.  The signatories to the Arbitration Agreement therefore did not intend to benefit FAS or FCC when executing the contract.  FAS and FCC are thus not third-party beneficiaries under the contract and therefore cannot compel arbitration under the contract.

On the other hand, Plaintiff THI-NM is an expressly covered entity against whom Mr. Patton's rights to bring certain claims in a court of law were waived.  THI-NM is therefore an intended third-party beneficiary to the Arbitration Agreement, and thus, can use that doctrine to enforce the terms of that agreement against Mr. Patton's Estate.  *Compare Gibson*, 181 F.3d at 1170 n.3 (noting that, even though Wal-Mart employee did not individually sign arbitration agreement, she was not precluded from enforcing arbitration agreement as to co-employee's claims against her,

where agreement specifically waived the co-employee's claims against Wal-Mart and Wal-Mart's employees, because "it is clear that [the employee] was, at the very least, a third party beneficiary of the Agreement"); *Rivera*, 2010-NMCA-046, ¶ 22 ("From the face of the agreement, both parties intended to confer to insurers of the truck, such as American Security, the right to compel arbitration under the terms of the Arbitration Provisions.  Because American Security belongs to a class of entities granted rights under the Arbitration Provisions, it has a right to compel arbitration as a third-party beneficiary."), *with Brantley*, 424 F.3d 396-97 (holding that non-signatory was not third-party beneficiary because language of contract did not clearly indicate that, at time of contracting, parties intended to provided non-signatory with a direct benefit).

## 2.    Equitable Estoppel Doctrine

Although Plaintiffs FAS and FCC cannot use the third-party beneficiary doctrine to compel arbitration, they seek to compel arbitration based on two alternative equitable estoppel grounds: (1) where a signatory (Mr. Patton's Estate) alleges substantially interdependent and concerted misconduct by both another signatory (Hobbs Center) and a non-signatory (FAS and FCC), or (2) where a signatory (Mr. Patton's Estate) relies on the terms of the contract in making a claim against a non-signatory (FAS and FCC).[8]

---

[8]*See Brantley*, 424 F.3d at 395-96 ("Existing case law demonstrates that equitable estoppel allows a nonsignatory to compel arbitration in two different circumstances.  First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must 'rely on the terms of the written agreement in asserting [its] claims' against the nonsignatory.  When each of a signatory's claims against a nonsignatory 'makes reference to' or 'presumes the existence of' the written agreement, the signatory's claims 'arise[ ] out of and relate [ ] directly to the [written] agreement,' and arbitration is appropriate.  Second, 'application of equitable estoppel is warranted . . . when the signatory [to the contract containing the arbitration clause] raises allegations of . . . substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.'") (quoting *MS Dealer*, 177 F.3d at 947).  The Court recognizes that Mr. Patton's Estate is not a signatory to the Admissions Agreement or Arbitration Agreement, but for purposes of this

In this case, Mr. Patton's Estate does not allege independent acts of liability on the part of FAS or FCC in the State Court Complaint.  Defendant does not distinguish the actions of either FAS or FCC from those of Hobbs Center, the signatory to the Admissions Agreement and Arbitration Agreement.  Instead, the State Court Complaint states: "Whenever the term 'Defendants' or 'Hobbs Center' is utilized within this suit, such term collectively refers to and includes all named Defendants in this lawsuit."  (State Court Compl. (Doc. 1-4) ¶ 22.)  The State Court Complaint similarly refers to all Defendants, except David Stroud, as "Corporate Defendants."  (*Id.* ¶ 24.)  According to the State Court Complaint, the Corporate Defendants "were engaged in a joint venture/enterprise during Mr. Patton's residency," (*id*. ¶ 25), and "operated as a joint venture/enterprise for the purpose of streamlining and furthering their similar business interests and collectively controlled Hobbs Center," (*id.* ¶ 29).  Based on the joint venture/enterprise, Mr. Patton's Estate alleged, "the acts and omissions of each participant in the joint venture/enterprise are imputable to all other participants."  (*Id.* ¶ 31.)  Mr. Patton's Estate therefore alleges substantially interdependent and concerted misconduct by both a signatory, Hobbs Center, and non-signatories, FCC and FAS.

As the Tenth Circuit recently explained, however, allegations of joint conduct between a defendant signatory and a defendant nonsignatory alone are not enough to estop a claimant from avoiding arbitration with the nonsignatory.  *See Medtronic*, 2011 WL 5545420, at *6.  "[A]llegations of collusion will support estoppel only when they establish that the claims against the nonsignatory are intimately founded in and intertwined with the obligations imposed by the contract containing

---

analysis, will assume Mr. Patton's Estate to be a signatory.  Because FAS's and FCC's argument fails on other grounds, the Court does not reach the issue of whether these equitable estoppel principles would also extend to a claimant who is not a signatory to an arbitration agreement but is nonetheless bound by the agreement based on equitable and third-party beneficiary theories.

the arbitration clause." *Id.* (internal quotations omitted). "The linchpin for equitable estoppel is equity-fairness." *Id.* (quoting *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000)). "The plaintiff's actual dependence on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the *sine qua non* of an appropriate situation for applying equitable estoppel." *Id.* Similarly, with respect to the second alternative ground asserted by Plaintiffs FAS and FCC, reliance on the contract is key – equitable estoppel only applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the agreement in asserting its claims against the non-signatory. *See id.* at *4; *American Bankers Ins. Group, Inc. v. Long*, 453 F.3d 623, 627 (4th Cir. 2006) (citing *MS Dealer*, 177 F.3d at 948). Arbitration is appropriate under this second equitable estoppel ground when each of the signatory claimant's causes of action against a non-signatory "are intertwined with the contract." *See Murken*, 2005-NMCA-102, ¶ 9.

The *Medtronic* case is instructive here. In *Medtronic*, the Tenth Circuit concluded, based on the allegations in the complaint, that the plaintiff implicitly alleged that the signatory to both the contract and arbitration agreement engaged in collusion with the defendant non-signatory entities, which were an overall parent company, an immediate parent company, and two affiliates of the signatory. *See id.* at *1-3, 6. The plaintiff in *Medtronic* similarly referred, in its complaint for antitrust violations, to all the defendants collectively. *Id.* at *3. Nevertheless, the Tenth Circuit declined to use equitable estoppel to allow the non-signatory defendants to compel arbitration because the antitrust claims were "not intimately founded in or intertwined with the obligations contained in the Agreement" containing the arbitration clause. *Id.* at *7. The Tenth Circuit noted that, although the agreement provided the opportunity for the non-signatory defendants to engage in the anti-competitive conduct alleged, the plaintiff was not attempting to hold the non-signatories

26

liable pursuant to duties imposed by the agreement, and the plaintiff's claims did not depend on whether the signatory's or non-signatories' conduct was proper under the agreement. *See id.* at *6. The Tenth Circuit concluded that the plaintiff did not rely on the terms of the agreement in a manner that would make it unfair for the plaintiff to avoid arbitrating its claims against the non-signatory defendants. *See id.* at *6-7.

Likewise, Mr. Patton's Estate has brought actions against FAS and FCC for negligence and misrepresentation. These underlying state claims, and the duties allegedly breached by FAS and FCC, arise from state tort law, not the Admissions Agreement. Because the Estate's claims against FCC and FAS are not intimately founded in or intertwined with the obligations contained in the Admissions Agreement, FAS and FCC cannot compel Defendant to arbitrate its claims against them based on the concerted misconduct equitable estoppel ground. For similar reasons, the second equitable estoppel ground asserted by FAS and FCC cannot provide them relief. Mr. Patton's Estate is not relying on the terms of the Admissions Agreement in asserting its claims against FAS and FCC, and thus, it would not be unfair to allow Mr. Patton's Estate to avoid arbitrating its claims with them. *See Medtronic*, 2011 WL 5545420, at *6.

This conclusion is not inconsistent with the Court's prior determination that Mr. Patton's Estate could be bound, as a non-signatory. The difference is that Mr. Patton was an intended third-party beneficiary to the Admissions Agreement and he received a direct benefit from the Arbitration Agreement itself. Hobbs Center would not have admitted him, and consequently, would not have assumed state law duties flowing from his admission, had Mr. Patton or his representative not signed the agreement to arbitrate. It would thus be unfair to allow Mr. Patton's Estate to receive the direct benefits of the Arbitration Agreement – admission into the facility – while simultaneously disavowing the availability of arbitration for signatories or intended beneficiaries of that agreement.

27

However, neither FAS nor FCC are signatories or intended third-party beneficiaries of the Arbitration Agreement.  Mr. Patton's Estate is thus not taking advantage of any contractual terms that relate to FAS or FCC nor repudiating any contractual terms that benefit FAS or FCC such that equity would compel Mr. Patton's Estate to arbitrate its tort claims against FAS and FCC.

Based on all the foregoing reasons, neither FAS nor FCC can compel arbitration against Mr. Patton's Estate.  The Court will therefore deny Plaintiffs' motion to compel arbitration as to FAS and FCC.

**D.**   **The Arbitration Agreement is Neither Procedurally nor Substantively Unconscionable**

Defendant seeks to avoid application of the Arbitration Agreement on grounds that it is unconscionable.   Unconscionability is an equitable doctrine that allows courts to render unenforceable an agreement that is unreasonably favorable to one party while precluding a meaningful choice of the other party.  *Rivera v. American Gen. Fin. Servs., Inc.*, 2011-NMSC-033, ¶ 43, 259 P.3d 803. Unconscionability is analyzed from both substantive and procedural perspectives.  *Id.*  Substantive unconscionability focuses on the legality and fairness of the contract terms, including such concerns as the commercial reasonableness and fairness of the terms, the purpose and effect of the terms, and the one-sidedness of the terms. *Id.* ¶ 45.  A contract term is substantively unconscionable if it is "grossly unreasonable" and against public policy.  *Id.* (quoting *Cordova v. World Finance Corp. of New Mexico*, 2009-NMSC-021, ¶¶ 22, 31, 146 N.M. 256).  In other words, contract terms that "unreasonably benefit one party over another are substantively unconscionable."   *Id.* ¶ 46 (quoting *Cordova*, 2009-NMSC-021, ¶ 25).   Procedural unconscionability, by contrast, "examines the particular factual circumstances surrounding the formation of the contract, including the relative bargaining strength, sophistication of the parties,

28

and the extent to which either party felt free to accept or decline terms demanded by the other." *Id.*
¶ 44 (quoting *Cordova*, 2009-NMSC-021, ¶ 23).  When determining procedural unconscionability,
a court should look at whether the contract is one of adhesion, a standardized contract offered by
a party with superior bargaining strength to a weaker party on a take-it-or-leave-it basis, without
opportunity for bargaining.  *Id.*  A contract may be rendered unenforceable under either substantive
or procedural unconscionability, or a combination of both.  *Id.* ¶ 47.  The two perspectives have an
inverse relationship: "[t]he more substantively oppressive a contract term, the less procedural
unconscionability may be required for a court to conclude that the offending term is unenforceable."
*Cordova*, 2009-NMSC-021, ¶ 24.

Defendant argues that the Arbitration Agreement is substantively unconscionable because
it is unreasonably one-sided in favor of Plaintiffs and it is procedurally unconscionable because Ms.
Barry was in a greatly diminished bargaining position in which she did not understand the arbitration
clause and did not feel free to decline the terms demanded.  This Court will first examine whether
the Arbitration Agreement is substantively unconscionable, an issue governed by two recent New
Mexico Supreme Court cases which held arbitration provisions to be sufficiently one-sided as to
render them substantively unconscionable.

### 1.        Substantive Unconscionability

In the first case, *Cordova v. World Finance Corp.*, 2009-NMSC-021, the New Mexico
Supreme Court voided an inherently one-sided form arbitration provision used by a small loan
company that limited a borrower to mandatory arbitration as a forum to settle all disputes, while
reserving for the lender the exclusive option of access to the courts for all remedies the lender was
"most likely" to seek against a borrower.  *Id.* ¶ 1.  After the borrower filed suit under the New
Mexico Unfair Practices Act, the lender filed a motion to compel arbitration under the FAA and the

New Mexico Uniform Arbitration Act, NMSA 1978 §§ 44-7A-1 to -32 (2001).  *Id.* ¶¶ 5, 7.  The

district court refused to uphold the arbitration agreement on grounds that it was so one-sided that

it could not be enforced.  *See id.* ¶ 8-9.

In affirming the district court's decision, the New Mexico Supreme Court described the one-

sided arbitration provisions as "egregious," and explained:

> In all cases of default, which is the most likely reason for lenders to take action
> against their borrowers, it broadly reserved the option of availing itself directly of
> any and all "remedies in an action at law or in equity, including but not limited to,
> judicial foreclosure or repossession."
>
> In striking contrast, as one of World Finance's borrowers, Cordova had no
> rights under the form agreement to go to any court for any reason whatsoever,
> including disputes about the validity of any of World Finance's form loan or
> arbitration documents, issues about the terms of World Finance's contract, claims for
> fraud and misrepresentation, grievances related to servicing or collection, or claims
> based on federal or state consumer protections, such as the New Mexico Unfair
> Practices Act, and tortious debt-collection causes of actions asserted in Cordova's
> complaint. Those are the claims a borrower is most likely to litigate in a dispute with
> a lender, and the very ones the lender is least likely to want to litigate. It is highly
> unlikely that World Finance will find itself at odds with the contractual terms of its
> own form agreements, or the circumstances of its lending or collection practices, or
> claim it was the victim of a fraudulent consumer scheme, or have any other reason
> to make a claim against its borrowers for violation of consumer protection laws.

*Id.* ¶¶ 26-27.  The court noted that it need not rely on any finding of procedural unconscionability

because "the substantive unconscionability of these one-sided arbitration provisions is so

compelling."  *Id.* ¶ 32.  The court further held that the FAA did not dictate a contrary result because

its holding was based on generally applicable unconscionability analysis.  *See id.* ¶¶ 37-38.  As a

remedy the *Cordova* court struck the arbitration agreement in its entirety and severed it from the

loan agreement.  *See id.* ¶ 40.

Two years later, the New Mexico Supreme Court again concluded that a form arbitration

agreement was unconscionable in *Rivera v. American General Financial Services, Inc.*, 2011-

NMSC-033, 259 P.3d 803.  In *Rivera*, the form car title loan used by the title loan lender contained

an arbitration agreement that encompassed "any and all claims" that the borrower could conceivably

have against the lender, including:

> without limitation, all claims and disputes arising out of, in connection with, or
> relating to [Rivera's] loan from Lender today or any previous loan from Lender
> (including all amendments, modifications and refinancings); any previous retail
> installment sales contract or loan assigned to Lender; all documents, actions, or
> omissions relating to this or any previous loan or retail installment sales contract;
> whether the claim or dispute must be arbitrated; the validity of the Arbitration
> Provisions, [Rivera's] understanding of them, or any defenses as to the enforceability
> of the Loan Agreement or the Arbitration Provisions; any negotiations between
> [Rivera] and lender; any claim or dispute based on the closing, servicing, collection,
> or enforcement of any transaction covered by the Arbitration Provisions; any claim
> or dispute based on an allegation of fraud or misrepresentation; any claim or dispute
> based on or arising under any federal or state statute or rule; any claim or dispute
> based on a contract or an alleged tort; and any claim for injunctive or equitable relief.

*Id.* ¶ 3.  The arbitration provisions, however, exempt from arbitration certain claims that the Lender

might have against the borrower:

> [Rivera] cannot elect to arbitrate Lender's self-help or judicial remedies including,
> without limitation, repossession or foreclosure, with respect to any property that
> secures any transaction described under the definition of "Covered Claims." In the
> event of a default under those transactions, Lender can enforce its rights to [Rivera's]
> property in court or as otherwise provided by law, and [Rivera] cannot require that
> Lender's actions be arbitrated.

*Id.*

After Rivera filed suit on multiple claims, including breach of contract, fraud, and violations

of the Unfair Trade Practices Act, against her Lender and its insurance company, which insured

Rivera's truck that had been used as collateral for a loan, the defendants filed motions to compel

arbitration. *See id.* ¶¶ 1, 4, 7.  The district court granted defendants' motions to compel arbitration,

which the New Mexico Court of Appeals affirmed after concluding that the arbitration clauses were

not substantively or procedurally unconscionable.  *See id.* ¶¶ 7-8.  In so holding, the Court of

Appeals construed *Cordova* as holding that "completely one-sided arbitration provisions are substantively unconscionable under New Mexico law." *Rivera v. Am. Gen. Fin. Servs.*, 2010-NMCA-046, ¶ 9, 148 N.M. 784. The Court of Appeals concluded that the arbitration provision in the case before it, unlike in *Cordova*, was not completely one-sided because it still allowed a borrower to compel arbitration of disputes about the loan note itself, such as a suit for money damages in default or a deficiency suit following an Article 9 sale of the truck. *See id.* ¶¶ 9-10. The Court of Appeals acknowledged that the right to compel arbitration was asymmetrical because the borrower was not free to compel arbitration of disputes over the lender's interest in the truck that secured the loans. *Id.* ¶ 12. The court nonetheless concluded that the lender reasonably excepted judicial foreclosure and repossession actions from arbitration because those actions are highly regulated by the statutory provisions governing secured transactions of the Uniform Commercial Code and, without access to these judicial and extra-judicial procedures, the lender would lose many of the statutory protections it enjoyed as a secured creditor. *See id.* ¶ 13.

Although not necessary to its decision, the New Mexico Supreme Court reached the conscionability issue in order to "correct the Court of Appeals' overly narrow construction of [the New Mexico Supreme Court's] holding in *Cordova*." *See Rivera*, 2011-NMSC-033, ¶¶ 10. The New Mexico Supreme Court clarified that "unfairly one-sided contract provisions" are unconscionable. *See id.* ¶¶ 49. It rejected the Court of Appeals' reasons for its conclusion that the lender reasonably excepted judicial foreclosure and repossession from claims covered by arbitration, noting that arbitrators have broad powers to resolve statutory claims and claims involving a lender's security interest in collateral. *See id.* ¶¶ 51-52. Instead, the New Mexico Supreme Court held:

> In its form loan contract, American General unilaterally chose the forum in which it wanted to resolve its disputes, ensuring that it could "enforce its rights to [Rivera's] property in court or as otherwise provided by law" while extinguishing Rivera's right

> to access the courts for any reason. By excepting foreclosure and repossession from arbitration, American General retained the right to obtain through the judicial system the only remedies it was likely to need. If Rivera's truck had not been destroyed and still had been worth $15,500, American General easily could have recouped the loan principal of $6,517 through repossession. American General's ability under the arbitration clause to seek judicial redress of its likeliest claims while forcing Rivera to arbitrate any claim she may have is unreasonably one-sided.

*Id.* ¶ 53. It therefore concluded that the arbitration provisions were "unfairly one-sided and void under New Mexico law." *Id.* ¶ 54.

Defendant relies on *Cordova* in arguing that the Arbitration Agreement here is substantively unconscionable because it requires her to arbitrate the claims she, as a resident, is most likely to have against the nursing home – tort, personal injury, negligence, contract, consumer protection, claims under the New Mexico Unfair Trade Practices Act, federal or state statutory or regulatory claims, or violations of right – while excepting the types of claims the nursing home is most likely to bring – guardianship proceedings, collection and eviction claims initiated by Hobbs Center, and any dispute where the amount in controversy is less than $2,500.

Plaintiffs first assert that the Arbitration Agreement is not as one-sided as Defendant construes it to be. Plaintiffs contend that the phrase "collection actions" in the Exclusion Clause does not refer to suits by the nursing home against residents for unpaid fees; rather, it is limited to execution of judgments.

The Court disagrees with Plaintiffs' interpretation of "collection actions" in the Exclusion Clause. The threshold question of whether a contract term is ambiguous is a question of law. *See C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 509 (1991). An agreement is ambiguous when its language permits more than one reasonable interpretation. *See Gutierrez v. Sundancer Indian Jewelry, Inc.*, 117 N.M. 41, 44 (Ct. App. 1993). Here, the term "collection action" is not defined by the Admission Agreement, so the Court will first look to the dictionary to determine the

33

natural, reasonable meaning of the term.  *See Carmichael*, 336 F.3d at 640; *Spingola*, 91 N.M. at 743.

The term "collect" means "to obtain payment or liquidation of [a debt or claim], either by personal solicitation or legal proceedings."  Black's Law Dictionary 263 (6th ed. 1990).  *See also* The American Heritage Dictionary 362 (4th ed. 2006) ("3.  To call for and obtain payment of").  The term "collection action" thus broadly encompasses a suit for non-payment – a legal proceeding to obtain payment.  While a "collection action" also may encompass an action to execute on a judgment, which is also a legal proceeding that may be necessary "to obtain payment," the term "collection action" in its usual usage is not limited to only judgment execution actions.  Rather, a judgment enforcement action is a term of art that is governed by specific statutory provisions, such that had the parties intended to only exclude actions to recover on a judgment, they would have used that specific term.  *Cf.* N.M. Stat. § 39-4-1 *et. seq.* ("Recovery of Judgments").

Nor is the phrase "collection actions," when construed broadly as a suit for non-payment, inconsistent with, or necessarily subsumed by, the third exclusion for any dispute of less than $2,500, as Plaintiffs contend.  Although a collection action may be for less than $2,500, and subsumed by the third exclusion, it could also be for more than that amount.  The "any dispute" language of the third exclusion broadly applies to all claims for money damages less than $2,500, whether a suit for non-payment, a tort, or other claim.  By separating out "collection actions," Hobbs Center ensured that all disputes of less than $2,500 would be brought at law and that all collection actions, even those for greater than $2,500, would be brought at law.  Finally, although "collection action" may be placed between two other proceedings that are highly regulated by statute, it is also placed near the exemption for "any dispute where the amount in controversy is less than [$2,500]," an exemption for disputes that are not so highly regulated as to be ill-suited for arbitration.  The

placement of "collection actions" in the Exclusion Clause thus does not indicate the parties' intent to limit the term to actions to enforce judgments.  Accordingly, this Court's interpretation of "collection action" is harmonious, and not incongruous, with the Exclusion Clause as a whole.

Plaintiffs nevertheless argue that, even if the term "collection actions" refers broadly to suits to recover fees, there are many other claims the nursing home could assert against a resident that would be subject to arbitration, and thus, the Arbitration Agreement is not unreasonably one-sided. Plaintiffs list the following examples of claims against residents that they, too, would have to arbitrate:  tort actions against a resident for money damages for negligent or intentional destruction of facility property or injury to other residents or staff; contribution or equitable indemnification arising from tort injuries inflicted by residents; malicious abuse of process; declaratory judgment actions regarding resident rights and for injunctive relief; and defamation.  Plaintiffs further contend that the Exclusion Clause also gives residents the rights to litigate certain claims they might have in court – guardianship proceedings and any dispute involving less than $2,500, such as suits for personal property damage.

There is no question that the Arbitration Agreement here is unequal.  Collection and eviction actions brought by Hobbs Center are exempted from arbitration.  Mere inequality, however, is not the standard.  *See Monette v. Tinsley*, 126 N.M. 748, 751 (Ct. App. 1999) (noting that imbalanced terms do not invalidate arbitration agreement unless they are so unreasonably favorable to one party as to rise to level of unconscionability).  *See also Conseco Finance Servicing Corp. v. Wilder*, 47 S.W.3d 335, 343 (Ky. App. 2001) (explaining that parties are not required to have equal arbitration rights because consideration in financing contract supported ancillary agreement to arbitrate disputes and to except certain claims of one party from the arbitration clause).  Instead, the one-sidedness must be "grossly unreasonable."  *Rivera*, 2011-NMSC-033, ¶ 45.

35

Unlike the provisions in *Rivera* and *Cordova*, parts of this Exclusion Clause apply to both parties, allowing residents to assert an array of suits involving less than $2,500 and guardianship proceedings in court.  Residents can also force Hobbs Center to arbitrate certain claims that it might have against the resident, for example, tort actions for money damages for negligent or intentional destruction of facility property or injury to other residents or staff, declaratory judgment actions regarding resident rights and for injunctive relief, and defamation.  Although the types of arbitrable claims Hobbs Center has may not be the most common claims it might assert, they are feasible, conceivable claims that are not outlandish.  In contrast, the arbitration clause in *Rivera* forced the borrower "to arbitrate *any* claim she may have."  *Rivera*, 2011-NMSC-033, ¶ 53 (emphasis added).  Similarly, the arbitration provision in *Cordova* gave the borrower "no rights under the form agreement to go to any court for *any reason whatsoever*."  *Cordova*, 2009-NMSC-021, ¶ 27 (emphasis added).

Moreover, Defendant has not provided this Court with any evidence on which to base a conclusion of what the "most likely" claims are that either residents or nursing homes would bring.  Where, as here, the Arbitration Agreement confines some claims by both parties to arbitration and other claims by both parties to proceed in a court of law, a court needs evidence on which to base a finding of the one-sided nature of the respective claims of the parties that are confined to arbitration.  For example, this Court does not have any facts as to the percentage of collection actions Hobbs Center brings or that other like nursing homes bring in comparison to total lawsuits.  This Court could only speculate that collection claims are the "most likely" claims a nursing home would bring, and conversely, that tort actions are the "most likely" claims a resident would bring.  Nor are these facts subject to judicial notice under Federal Rule of Evidence 201.  Consequently, based on the inadequate facts in the record, the Court is unable to find that the Exclusion Clause

36

results in a disparate impact on the parties, such that, in practice, the Arbitration Agreement results in an unreasonably one-sided agreement that is substantively unconscionable.

### 2.      Procedural Unconscionability

Nor does the Court find the Admission Agreement procedurally unconscionable.  Defendant argues that Ms. Barry was in a greatly diminished bargaining position where she did not understand the arbitration clause and did not feel free to decline the terms demanded.  Each party to a contract, however, has a duty to read and familiarize herself with its contents before signing it, and thus, a party who executes and enters a written contract is presumed to know the terms of the agreement and to have agreed to each of its provisions in the absence of fraud, misrepresentation, or some other wrongful act.  *See Smith v. Price's Creameries*, 98 N.M. 541, 545 (1982).  In this case, the terms of the Arbitration Agreement are straight-forward and clear enough that an unsophisticated lay person could understand.  Paragraph I of the Arbitration Agreement plainly explains what arbitration is and the primary consequence of signing the Arbitration Agreement, *i.e.*, that the resident was giving up his or her constitutional right to have the listed disputes decided in a court of law before a jury and was instead accepting the use of arbitration.  The waiver of that right was repeated in the last paragraph of the Arbitration Agreement in all capital letters and in bold.  There are no other facts before the Court to suggest that Ms. Barry was of such diminished capacity or intelligence that she was incapable of understanding the ramifications of signing the Arbitration Agreement or that Hobbs Center used fraud or misrepresentation, or otherwise acted wrongfully.

Nor is Ms. Barry's mere subjective feeling of not being free to decline arbitration terms enough to demonstrate procedural unconscionability.  A contract is procedurally unconscionable "only where the inequality is so gross that one party's choice is effectively non-existent." *Guthmann v. LaVida Llena*, 103 N.M. 506, 510 (1985), *overruled on other grounds by Cordova*,

37

2009-NMSC-021, ¶ 31.  Factors in this analysis include the use of high pressure tactics; the relative

education, sophistication, or wealth of the parties; and the relative scarcity of the subject matter of

the contract.  *Id.*  There is no evidence in this case that Hobbs Center pressured Ms. Barry to sign

the contract or that there were no other reasonable nursing home facilities available to Mr. Patton

such that she was forced to accept the arbitration terms.

Accordingly, neither substantive nor procedural unconscionability, nor a combination of the

two, is sufficiently present in this case to invalidate the Arbitration Agreement.[9]

---

[9]Moreover, even if the Exclusion Clause were unconscionable, the proper remedy
according to the plain terms of the Arbitration Agreement would be to strike that provision
alone, not the entire Arbitration Agreement. Generally, when faced with an unconscionable
provision, a court may refuse to enforce the contract, enforce the remainder of the contract
without the unconscionable provision, or may limit the application of any unconscionable
provision as to avoid any unconscionable result. *Cordova*, 2009-NMSC-021, ¶ 39 (quoting
*Padilla v. State Farm Mut. Auto. Ins. Co.*, 2003-NMSC-011, ¶ 15, 133 N.M. 661).  In *Cordova*
and *Rivera*, the New Mexico Supreme Court refused to re-fashion the arbitration provisions in an
attempt to create a fair and balanced arbitration agreement. *Cordova*, 2009-NMSC-021, ¶¶ 39-
40, *Rivera*, 2011-NMSC-031, ¶ 56.  Instead, the court "str[uck] down the arbitration clause in its
entirety to avoid a type of judicial surgery that inevitably would remove provisions that were
central to the original mechanisms for resolving disputes between the parties." *Cordova*, 2009-
NMSC-021, ¶ 40.
Unlike in *Cordova* and *Rivera*, here the Arbitration Agreement contains the following
savings clause: "In the event a court having jurisdiction finds any portion of this Agreement
unenforceable, that portion shall not be effective and the remainder of the Agreement shall
remain effective."  In determining whether a contract provision is severable, "the governing
principle is the manifested intention of the parties in view of the nature of the contract." *Arrow
Gas Co. of Dell City v. Lewis*, 71 N.M. 232, 239 (1963).  If the language of the contract clearly
indicates the intention of the parties to sever unenforceable provisions from the contract, the
court should sever the void provision and enforce the remainder. *See Fancher v. Board of
Com'rs of Grant County*, 210 P. 237, 248 (1921). *See also Security Serv. Fed. Credit Union v.
Sanders*, 264 S.W.3d 292, 300 ("Severability is determined by the intent of the parties as
evidenced by the language of the contract.").
Here, the Arbitration Disputes Clause applies to both parties.  It compels arbitration for
disputes between the parties "arising out of or relating to Resident's stay at the Health Care
Center, the Health Care Center's Admission Agreement or breach thereof, or relating to the
provision of care or services to Resident."  Striking only the Exclusion Clause would mean that
the Arbitration Disputes Clause would remain in effect and bind both the resident and nursing
home to arbitrate the claims either would most likely bring against one another.  For example,

**IV.     CONCLUSION AND RELIEF**

Plaintiffs have satisfied their burden of establishing an agreement to arbitrate that binds Defendant and Plaintiffs Hobbs Center and THI-NM.  Based on the record, the Court cannot conclude that the Arbitration Agreement is substantively or procedurally unconscionable.  It also is undisputed that all the causes of action brought by Mr. Patton's Estate in the State Court Action fall within the broad scope of arbitrable claims within the Arbitration Agreement and that the transaction involves interstate commerce.  The Court will thus, under Section 4 of the FAA, compel Defendant to arbitrate her state claims against Plaintiffs Hobbs Center and THI-NM.  Plaintiffs FCC and FAS have not met their burden of demonstrating that they can compel arbitration under the agreement, and thus, the Court will not compel Defendant to arbitrate the state claims against Plaintiffs FCC and FAS.

Additionally, Plaintiffs move to stay this proceeding under Section 3 of the FAA, and to stay Defendant's State Court Action under the All Writs Act, 28 U.S.C. § 1651, and the Anti-Injunction Act, 28 U.S.C. § 2283.  The Court will not stay these two proceedings for the reasons that follow.

Section 3 of the FAA provides:

*If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending*, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, *shall*

---

collection actions arise from the Admission Agreement and breach thereof, and thus, would be subject to arbitration if the Exclusion Clause alone were struck.  Striking the Exclusion Clause thus eliminates the one-sided nature of the contract, comports with both the plain language of the savings clause and the policy behind the FAA, and promotes the central purpose of the parties in entering the agreement to arbitrate.  Therefore, even if this Court concluded that the Arbitration Agreement were substantively unconscionable, the appropriate remedy would be to sever the Exclusion Clause and enforce the remainder of the Arbitration Agreement.  The Court would thus still grant Plaintiff Hobbs Center's and THI-NM's request to compel Ms. Patton to arbitrate her claims against them.

> *on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement*, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3 (emphasis added). Section 3's requirement that a court, upon determining that the claim involved in the suit is referable to arbitration under the agreement, stay the trial of the action until arbitration has occurred in accordance with the terms of the agreement, only applies when the court has the underlying substantive suit before it. Had Mr. Patton's Estate sued Plaintiffs Hobbs Center and THI-NM in federal court, then this Court would be required to stay trial of the matter until the completion of arbitration. Similarly, had the motion to compel arbitration been filed in the State Court Action, and had the state court resolved the issue in the same manner, then Section 3 would require the state court to stay trial of the claims pending arbitration. *See Moses H. Cone*, 460 U.S. at 25-26 (explaining that state courts, as much as federal courts, are obliged to enforce FAA and to grant stays of litigation under § 3 of the Arbitration Act). Mr. Patton's Estate, however, sued in state court, while Plaintiffs moved to compel arbitration in federal court. Section 3 thus does not apply to this situation. *See Moses H. Cone*, 460 U.S. at 25 n.32 ("Section 3 likewise limits the federal courts to the extent that a federal court cannot stay a suit pending before it unless there is such a suit in existence. Nevertheless, although enforcement of the Act is left in large part to the state courts, it nevertheless represents federal policy to be vindicated by the federal courts where otherwise appropriate. We need not address whether a federal court might stay a state-court suit pending arbitration under 28 U.S.C. § 2283.").

Plaintiffs also rely on the All Writs Act, which states that a federal court "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. The relief of the All Writs Act, however, is subject to the limitations expressed in the Anti-Injunction Act, which provides: "A court of the United States may

40

not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283.  "Any doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy." *Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 297 (1970).  Plaintiffs have not provided, nor has this Court found, any binding authority determining whether a federal court may or must stay a state-court suit pending compelled arbitration.

This Court is not persuaded that the FAA authorizes or requires such an injunction.  As aforementioned, Section 3 only provides that "the court in which such suit is pending" must stay proceedings if arbitration is required.  Section 3 thus is not the express, unambiguous grant of authority by Congress for a federal court to stay state court proceedings.  *See* 9 U.S.C. § 3; *United Service Protection Corp v. Lowe*, 354 F.Supp.2d 651, 659 (S.D.W.Va. 2005).  Nor is this Court persuaded that a stay of state court proceedings is necessary to aid its jurisdiction or to protect or effectuate its judgments.  This case is before the Court under Section 4, which gives this Court authority to order *parties* to arbitrate where diversity or federal question jurisdiction is present.  This Court has now resolved the issues of arbitration pending before it, and will order Defendant to arbitrate with Plaintiffs Hobbs Center and THI-NM.  The Court fully expects the parties to comply with this Order, but should a party not so comply, dismissal of this case does not prevent a party from bringing a judgment enforcement action to compel compliance.  This Court therefore has the tools at its disposal to protect and effectuate its judgment and to aid in its jurisdiction without resorting to an injunction against the state court.  Moreover, the state court is bound to follow the FAA, just as is this Court, and there is no reason to believe the state court will force Defendant to

41

proceed with the claims against Plaintiffs Hobbs Center and THI-NM in contravention of the FAA and this Order.  The Court will therefore deny Plaintiffs' request for an order to stay the State Court Action.  *Cf. Lowe*, 354 F.Supp.2d at 659-60 (denying plaintiffs' request for order staying state court proceedings in underlying dispute after finding that none of three exceptions to Anti-Injunction Act applied because Section 3 of FAA does not reference injunctive relief against underlying state-court proceedings and the parties and state court would likely conform their conduct to expectations of law such that injunction was unnecessary).  *See also JPMorgan Chase Bank, N.A. v. Lott*, No. 5:06CV102KS-MTP, 2007 WL 30271, at *5 n.6 (S.D.Miss. Jan. 3, 2007) (same).[10]

Finally, neither Section 3 nor Section 4 require the Court to stay this case when the only issue before it is whether to compel arbitration and that issue has been resolved.  Given that this Court has resolved all pending matters before it and Plaintiffs have offered no compelling reasons why this Court should stay the case pending arbitration, this Court will deny Plaintiffs' request for a stay in this case.  *See American Heritage Life Ins. Co. v. Beasley*, Nos. 01-60835-No. 01-60877, 37 Fed. Appx. 712, *1 (5th Cir. May 22, 2002) (unpublished opinion) ("Here, the only issue before the district court was whether to compel arbitration. When it did so, there was nothing more for it to do but execute judgment.").

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion to Compel Arbitration (**Doc. 3**) is **GRANTED** in part and **DENIED** in part as follows:

---

[10]It should be noted that the State Court Action involves additional parties who have not moved to arbitrate their claims, and this Court has determined that FCC and FAS are not entitled to compel arbitration.  Nothing in this Memorandum Opinion and Order should be interpreted as suggesting whether the state court should stay the remainder of the State Court Action pending arbitration of Mr. Patton's Estate's claims against Hobbs Center and THI-NM.

1.      Plaintiffs' request to compel arbitration is **GRANTED** as to Defendant's claims asserted in the State Court Action against Plaintiffs THI of New Mexico at Hobbs Center, LLC, and THI of New Mexico, LLC, but is **DENIED** as to Defendant's claims asserted in the State Court Action against Plaintiff Fundamental Administrative Services, LLC, and Fundamental Clinical Consulting, LLC.

2.      This Court **ORDERS** Defendant to arbitrate the claims asserted in the State Court Action against Plaintiffs THI of New Mexico at Hobbs Center, LLC, and THI of New Mexico, LLC, in accordance with the terms of the Arbitration Agreement.

3.      Plaintiffs' request for an order to stay Defendant's State Court Action is **DENIED**.

4.      Plaintiffs' request to stay this proceeding is **DENIED**.

5.      This case is therefore **DISMISSED**.


_____

**SENIOR UNITED STATES DISTRICT JUDGE**